IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

WESTFIELD INSURANCE COMPANY
a/s/o Insureds,

        Plaintiff,

  v.

INTERLINE BRANDS, INC., et al.,

        Defendants.

Civil No. 12-6775 (JBS/JS)

**OPINION**

APPEARANCES:

Daniel Hogan, Esq.
Kevin P. Smith, Esq.
Law Offices of Robert A. Stutman, PC
500 Office Center Drive
Suite 301
Fort Washington, PA 19034
    Attorneys for Plaintiff Westfield Insurance Company

Rachel Katherine Snyder von Rhine, Esq.
Marshall Dennehey Warner Coleman & Goggin
200 Lake Drive East
Suite 300
Cherry Hill, NJ 08002
    Attorney for Defendant Interline Brands, Inc.

George W. Wright, Esq.
Narinder S. Parmar, Esq.
George W. Wright & Associates, LLC
505 Main Street
Hackensack, NJ 07601
    Attorneys for Defendant MTD (USA) Corporation

Ralph R. Smith, III, Esq.
Capehart Scatchard
8000 Midlantic Drive Suite 300S
P.O. Box 5016
Mount Laurel, NJ 08054
    -and-
Benjamin C. Sassé, Esq.

Tucker Ellis LLP
950 Main Avenue
Suite 1100
Cleveland, OH 44113
    Attorneys for Defendants Watts Water Technologies, Inc. and
    Watts Regulator Co.

Adam Brian Kaplan, Esq.
Susan Lynn Swatski, Esq.
Hill Wallack LLP
202 Carnegie Center
Princeton, NJ 08540
    -and-
Denise Marie Montgomery, Esq.
Sweeney & Sheehan PC
216 Haddon Avenue
Suite 500
Westmont, NJ 08108
    Attorneys for Defendant Linx, LTD

**SIMANDLE**, Chief Judge:

## I. Introduction

    This action comes before the Court on Defendant Interline

Brands Inc.'s second motion to sever and transfer filed November

18, 2013 [Docket Item 189]; Defendant Linx, LTD's motion to

compel arbitration filed May 15, 2013 [Docket Item 77]; and

Defendant Watts Water Technologies' motion for summary judgment

filed May 15, 2013 [Docket Item 75].

    Plaintiff Westfield Insurance Company brings the underlying

tort claims on behalf of four insureds for property damages

allegedly sustained by faulty toilet water supply lines. The

Court heard oral argument on September 20, 2013 regarding nine

motions and subsequently allowed a period of expedited

jurisdictional discovery. This Opinion addresses the three

motions remaining before the Court.

For the reasons discussed below, the Court will deny Linx's motion to compel arbitration and Interline's motion to sever and transfer. The Court will grant Watts Water Technologies' motion to dismiss for lack of personal jurisdiction.

## II. Background

### A. Factual Background

This action is an insurance subrogation action brought by Plaintiff Westfield Insurance Company ("Plaintiff" or "Westfield") on behalf of four insureds who suffered property damage due to allegedly faulty toilet supply lines manufactured and distributed by Defendants: Interline Brands, Inc. ("Interline"); MTD (USA) Corporation ("MTD"); Watts Water Technologies ("WWT"); Watts Plumbing Technologies (Taizhou) Co., LTD ("WPT"); Watts Regulator Co. ("Watts Regulator"); Linx, LTD ("Linx"); and Everlotus Brands, Inc. ("Everlotus").[1] The property damage at issue occurred in three separate states and caused Plaintiff to make payments to its insureds of at least $199,000.[2]

---

[1] Plaintiff also named fictitious defendants John Does (1-100). Defendant Everlotus has not entered an appearance or responded in any manner to the filings in this action.

[2] The Justin Miller matter involved property located in Indiana and payment of $86,917.26. The Adam and Leah Koenig and Olentangy Point and Cove matters involved properties located in Ohio and payments of "at least $75,000" and $23,210.85 respectively. The Betty Carol Williams matter involved property located in Tennessee and payment of $14,767.84. (See Amended Complaint, Schedule A [Docket Item 162.])

Plaintiff's Amended Complaint filed October 8, 2013 asserts claims for negligence, failure to warn, breach of warranty, strict liability, and fraudulent concealment, as well New Jersey Product Liability Act violations. [Docket Item 162.] Specifically, Plaintiff alleges that Defendants designed, manufactured, and distributed DuraPro brand toilet supply lines that had defective polymeric coupling nuts, which cracked and caused water damage to insureds' property. Plaintiff contends that each insureds' property damage was caused by the same product defect, i.e., cracking of the polymeric coupling nuts.

There are, however, different manufacturers and distributors connected with the various toilet supply line products. In the present action, the parties agree that two distinct chains of manufacture and distribution are at issue. One involves toilet supply lines with "winged" coupling nuts allegedly manufactured by Everlotus and distributed by MTD. The other involves toilet supply lines with "ribbed" coupling nuts allegedly manufactured by WPT and distributed by Linx and Interline and/or Watts Regulator.

Defendants MTD and Interline are incorporated in New Jersey.[3] The remaining defendants are incorporated in other states and maintain principal places of business outside New

---

[3] Plaintiff alleges that both MTD and Interline maintain principal places of business in New Jersey, but Interline contends its principal place of business is in Florida.

4

Jersey.[4] WPT is a Chinese corporation with its principal place of business in China. According to WWT, WWT is a holding company and Watts Regulator is WWT's wholly-owned subsidiary. WPT is a wholly-owned subsidiary of Watts Regulator.

Nine other insurance subrogation actions involving faulty toilet supply lines have been filed in Atlantic County Superior Court against these Defendants.[5] There is an application for centralized management pending before the New Jersey Administrative Office of the Courts regarding the nine state court actions.

**B. Procedural Background**

The procedural background of this case is complex and warrants a thorough recounting. This action was initially filed in Atlantic County Superior Court. WWT, WPT, and Watts Regulator (collectively "Watts Defendants") removed pursuant to 28 U.S.C. § 1441(b) on the basis of diversity jurisdiction. [Docket Item 1 ¶ 4.] The Court issued an Opinion and Order on March 25, 2013, denying Plaintiff's first motion to remand, finding that the

---

[4] Plaintiff alleges that WWT is a Delaware corporation with its principal place of business in Massachusetts, Watts Regulator is a Massachusetts corporation with its principal place at the same address in Massachusetts, Linx is a Rhode Island corporation with its principal place of business in Rhode Island, and Everlotus is a Chinese corporation with its principal place of business in China.

[5] Two of the nine pending state court actions also include Zhejiang Dingbo Plumbing Manufacturing Co., Ltd. as a defendant.

action was properly removed on the basis of diversity jurisdiction. [Docket Items 49 & 50.]

On September 20, 2013, the Court heard oral argument regarding nine motions: Plaintiff's second motion to remand filed July 19, 2013 [Docket Item 106]; Defendant Interline's motion to sever, dismiss, and transfer filed May 15, 2013 [Docket Item 74]; Defendant WWT's motion for summary judgment filed May 15, 2013 [Docket Item 75]; Defendant WPT's motion for summary judgment filed May 15, 2013 [Docket Item 76]; Defendant Linx's motion to dismiss for forum non-conveniens or alternatively to compel arbitration filed May 15, 2013 [Docket Item 77]; Defendant Watts Regulator's motion for summary judgment filed May 15, 2013 [Docket Item 78]; Defendant WWT's motion to dismiss Defendant MTD's cross-claims filed May 28, 2013 [Docket Item 83]; Defendant WPT's motion to dismiss Defendant MTD's cross-claims filed May 28, 2013 [Docket Item 84]; and Defendant Watts Regulator's motion for summary judgment on Defendant MTD's cross-claims filed June 6, 2013 [Docket Item 94].

In an Opinion and Order dated October 1, 2013, the Court denied Plaintiff's second motion to remand based on the Colorado River abstention doctrine. [Docket Items 157 & 158.] The Court addressed the other eight motions in a separate Order of the same date. [Docket Item 159.] The Court dismissed Defendant Interline's motion to sever, dismiss, and transfer and Linx's

6

motion to dismiss for forum non-conveniens without prejudice
because the parties briefed state, not federal, law regarding
severance, transfer, and forum non-conveniens. The Court allowed
the parties 30 days to refile. The Court granted Defendant WPT's
motion for summary judgment and motion to dismiss Defendant MTD's
cross-claims because Plaintiff conceded at oral argument that
WPT, which is a foreign corporation, had not been properly served
in accordance with the Hague Convention. Accordingly, WPT was
terminated as a party. The Court continued Defendant WWT's motion
for summary judgment [Docket Item 75] and motion to dismiss
Defendant MTD's cross-claims [Docket Item 83] pending further
expedited discovery regarding WWT's contacts with New Jersey
relevant to the Court's exercise of personal jurisdiction.

The Court also continued Defendant Linx's motion to compel
arbitration [Docket Item 77] pending further expedited discovery
to clarify the arbitration rules that would apply if the Court
compelled arbitration for the arbitration agreement signatories:
Plaintiff, Linx, WWT, WPT, and Watts Regulator. The Court
dismissed as premature Defendant Watts Regulator's motion for
summary judgment [Docket Item 78] and motion for summary judgment
on Defendant MTD's cross-claims [Docket Item 94] pending
resolution of Defendant Linx's motion to compel arbitration.

On October 8, 2013, Plaintiff filed an amended complaint,
seeking declaratory judgment against the Watts Defendants for

joint venture and alter ego liability.[6] [Docket Item 162.]

Defendant Linx's Answer to Plaintiff's Amended Complaint also

seeks declaratory judgment on these grounds.[7] On October 16,

2013, after Plaintiff and WWT submitted a "stipulation of

dismissal," the Court entered an Order dismissing Plaintiff's

claim against WWT without prejudice to refiling by Plaintiff or

Defendants pursuing their cross-claims against WWT. [Docket Item

170.] On October 23, 2013, the Court signed a consent order

dismissing with prejudice Defendant MTD's cross-claims against

the Watts Defendants. [Docket Item 180.]

On October 28, 2013, the Court conducted a telephone hearing

to clarify the scope of expedited jurisdictional discovery

permitted by the Court's October 1, 2013 Order. In an Order dated

October 29, 2013, the Court denied Linx's request for further

jurisdictional discovery on its theory that WWT is an alter ego

of Watts Regulator or WPT as beyond the scope of the limited

discovery contemplated by the Court's October 1 Order. [Docket

Item 184.] The Court denied Linx's request without prejudice to

---

[6] In response to Plaintiff's Amended Complaint, Interline
reasserted cross-claims against all co-defendants [Docket Item
163], Linx reasserted cross-claims against the Watts Defendants
[Docket Item 165], and MTD reasserted cross-claims against
Interline, Linx, and Everlotus [Docket Item 185.]
[7] Linx seeks declaratory judgment that WWT and/or Watts Regulator
entered into a joint venture with WPT and that Watts Regulator
"was so dominated by WWT that the corporate veil can be pierced
under the theory of alter ego." (Linx Ans. [Docket Item 165] ¶
43.)

Linx arguing for such a basis of personal jurisdiction and without prejudice to pursuing a theory of alter ego liability on the merits.

Remaining before the Court are Defendant Interline's second motion to sever and transfer filed November 18, 2013 [Docket Item 189]; Defendant Linx's motion to compel arbitration filed May 15, 2013 [Docket Item 77]; and Defendant WWT's motion for summary judgment filed May 15, 2013 [Docket Item 75].

### III. Motion to Compel Arbitration by Linx

Defendant Linx filed a motion to dismiss for forum non-conveniens or alternatively, to compel arbitration on May 15, 2013. This motion was opposed by Plaintiff in its entirety.[8] Pursuant to the October 1, 2013 Order, the Court permitted the parties to take the deposition of Tim McKernan, Manager of Quality, Training, and Forum Rules for Arbitration Forums, Inc. to clarify the arbitration forum rules applicable if the Court compels arbitration as to the signatories of the arbitration agreement. Following McKernan's deposition on October 14, 2013, Linx, Plaintiff, and Watts Regulator submitted supplemental briefing. For the reasons discussed below, the Court will deny Linx's motion.

It is undisputed that Plaintiff, Linx, and the Watts Defendants are signatories to an agreement to arbitrate with a

---

[8] None of the other defendants responded.

private arbitration company called Arbitration Forums, Inc. ("AFI").[9] However, Defendants MTD, Interline and Everlotus are not signatories to the arbitration agreement.

Linx argues that, pursuant to the terms of the agreement, Plaintiff is subject to compulsory arbitration in AFI. Alternatively, Linx argues that equitable estoppel requires non-signatories to arbitrate.[10] In its supplemental briefing, Linx contends that the Court's inquiry is moot because Interline now consents to arbitration and MTD is irrelevant to Plaintiff's claims against Linx.

Plaintiff argues that Linx's equitable estoppel theory is misplaced and that, under the arbitration agreement, it is not subject to compulsory arbitration where its claims involve non-signatory parties. Instead, where Plaintiff's claim involves non-signatory parties, Plaintiff has the option of either filing in AFI against signatories and consenting non-signatories, or pursuing litigation against all parties. Therefore, Plaintiff argues that Linx's motion to compel arbitration is frivolous.

Watts Regulator states that it does not oppose arbitration and supports Linx's argument that MTD's status as a non-signatory

---

[9] For background on AFI, see the Declaration of Tim McKernan, Ex. V to Plaintiff's Opposition Brief. [Docket Item 120-24.]

[10] In its initial opposition, Interline raised similar arguments that it is not a signatory to the arbitration agreement and cannot be compelled to arbitrate under principles of contract or agency law.

is irrelevant to the Court's analysis. Watts Regulator requests that the Court consider Linx's motion to compel arbitration on a claim-by-claim basis because there are two distinct product lines at issue. According to Watts Regulator, the product line involving a "ribbed" coupling nut allegedly manufactured by a Watts entity is wholly unrelated to the product line involving "winged" coupling nuts allegedly manufactured by Everlotus and distributed by MTD.

The Third Circuit has repeatedly recognized that the Federal Arbitration Act ("FAA") establishes a "strong federal policy in favor of the resolution of disputes through arbitration." <u>Nino v. Jewelry Exch., Inc.</u>, 609 F.3d 191, 200 (3d Cir. 2010). Under the FAA, arbitration agreements "are enforceable to the same extent as other contracts." <u>Alexander v. Anthony Int'l, L.P.</u>, 341 F.3d 256, 263 (3d Cir. 2003). "A party to a valid and enforceable arbitration agreement is entitled to a stay of federal court proceedings pending arbitration as well as an order compelling such arbitration." <u>Id.</u>

"[A] non-signatory cannot be bound to arbitrate unless it is bound under traditional principles of contract and agency law to be akin to a signatory of the underlying agreement." <u>E.I. DuPont de Nemours and Co. v. Rhone Poulenc Fiber and Resin Intermediates, S.A.S.</u>, 269 F.3d 187, 194 (3d Cir. 2001) (citation omitted). "There are five theories for binding nonsignatories to

arbitration agreements: (1) incorporation by reference, (2) assumption, (3) agency, (4) veil-piercing/alter ego, and (5) estoppel." Trippe Manufacturing Co. v. Niles Audio Corp., 401 F.3d 529, 532 (3d Cir. 2005).

"Estoppel can bind a non-signatory to an arbitration clause when that non-signatory has reaped the benefits of a contract containing an arbitration clause." Invista S.A.R.L. v. Rhodia, S.A., 625 F.3d 75, 85 (3d Cir. 2010). "This prevents a non-signatory from cherry-picking the provisions of a contract that it will benefit from and ignoring other provisions that don't benefit it or that it would prefer not to be governed by (such as an arbitration clause)." Id.

In this case, the Court must address two issues. First, the Court must address whether the arbitration agreement requires Plaintiff to arbitrate with the signatory defendants despite the presence of non-signatories in this dispute. Second, the Court must determine whether equitable estoppel applies to require the non-signatory defendants to arbitrate this case.

**A. Arbitration Agreement**

Addressing the first issue, the Arbitration Agreement contains several provisions which govern whether the Plaintiff is required to arbitrate this dispute. The Arbitration Agreement among the signatory parties is a Property Subrogation Agreement available to members of AFI. First, in Article First - Compulsory

Provisions, the Arbitration Agreement provides:

**Compulsory Provisions**

Signatory Companies must forego litigation and submit any **personal, commercial, or self-insured** property subrogation claims to Arbitration Forums, Inc.

(Linx Br. Ex. L [Docket Item 77-1] at 1) (emphasis in original).

Second, the Arbitration Agreement provides in Article Second:

**Exclusions**

No company shall be required, without its **written consent**, to arbitrate any claim or suit if:

(a) it is not a signatory company nor has given written consent.
(b) such claim or suit creates any cause of action or liabilities that do not currently exist in law or equity; or
(c) its policy is written on a retrospective or experience-rated bases; or
(d) any payment which such signatory company may be required to make under this Agreement is or may be in excess of its policy limits. However, an Applicant may agree to accept an award not to exceed policy limits and waive their right to pursue the balance directly against the Respondent's insured; or
(e) it has asserted a denial of coverage; or
(f) any claims which a lawsuit was instituted prior to, and is pending, at the time the Agreement is signed; or;
(g) it is a watercraft claim(s) arising from accidents on waters under federal or international jurisdiction; or
(h) under the insurance policy, settlement can be made only with the insured's consent.

(Id.) Finally, Article Fourth provides:

**Non-Compulsory Provisions**

The parties may, with written consent, submit a claim:
(a) that exceeds this forum's monetary limit, or
(b) where a non-signatory wants to participate.

> Once a company gives written consent, All Articles and
> Rules of this forum are applicable, and the company may
> not revoke its consent.

(Id.) Linx argues that the compulsory provisions in Article First

mandate arbitration between signatory members. Linx argues that

the mere presence of non-members should not void the obligation

to arbitrate among the signatory members. Plaintiff argues that

the presence of non-members means that the Plaintiff has the

right to pursue its claims in a litigation forum. Plaintiff

relies on Article Fourth of the Arbitration Agreement and

specifically cites to the Reference Guide to Arbitration Forum's

Agreements and Rules. With regard to Article Fourth, the

Reference Guide states:

> Article Fourth also allows a non-signatory to consent
> to participate in a specific case with the consent of
> all signatory parties involved in the dispute as well
> as the non-signatory party. The requirement that all
> parties consent in writing prevents nonmembers from
> "picking and choosing" which cases to submit to
> arbitration. Because of the compulsory provisions of
> the Agreement, signatories do not have the opportunity
> to select cases.

(Linx Reply Ex. B [Docket Item 129-3] at 18.) Chapter 13 of the

Reference Guide addresses Rule 1-4, Impleading, which states:

> A responding company may add other members or
> consenting nonmembers and/or argue the negligence of
> the unnamed party(ies). Upon receipt of the answer, the
> filing company may amend its application to add other
> members or consenting nonmembers or withdraw its
> application to pursue recovery by other means. If the
> filing company allows the case to be heard, it thereby

agrees to accept the award, if any, against any responding company and waive its right to pursue the balance directly from any other party.

(Id. at 28.) In the comments to this Rule, the Reference Guide states:

> The filing company has the initial obligation, when filing its claim in arbitration, to name all potentially liable parties (members or consenting nonmembers).
> . . .
> In the event a potential tortfeasor is not a signatory and does not consent to participate in the arbitration or the allegation of another party's negligence is a surprise, the filing company can also withdraw its filing to pursue all parties in another venue outside of arbitration, such as litigation, or it re-files arbitration at a later date, subject to the applicable statute of limitations.

(Id.) Plaintiff argues that this language in the Reference Guide gives it the right to file claims in court when a non-signatory tortfeasor is involved. Linx maintains that this comment does not trump the compulsory provision that signatory members are required to forgo litigation and arbitrate their claims.

During his deposition, McKernan testified that arbitration in AFI is only compulsory when all parties to the claim are signatories. (Deposition of Tim McKernan on October 14, 2013 ("McKernan Dep.") [Docket Item 187-2] 14:13-18.) He repeatedly stated that when a non-signatory is involved, arbitration is not compulsory, and the claimant may either file in AFI against the signatories and consenting non-signatories or pursue its claim through litigation. (Id. 10:21-11:12; 12:20-24; 35:8-10; 38:10-

20.) Further, McKernan testified that the claimant may not be forced to arbitrate even where a non-signatory consents. (Id. 17:16-18:16.) McKernan clarified that if the claimant pursues a claim in AFI against signatories, the claimant waives its right to pursue non-signatories outside AFI. (Id. 11:18-24.)

Accordingly, Plaintiff maintains that if the Court compels arbitration against signatories in AFI, it will exercise its right under Rule 1-4 to withdraw its claim and pursue litigation.

Linx contends that McKernan testified otherwise and confirmed that a signatory defendant may compel arbitration against a claimant where the claim involves non-signatory defendants. However, Linx relies on a portion of the deposition in which McKernan disclaimed any knowledge of the legal system and stated that the only way a claimant could be required to arbitrate a claim involving non-signatories would be through court intervention. (See id. 25:1-26:20.) Notably, McKernan testified that the AFI rules do not contemplate such a result. (Id. 33:19-35:22.)

After analyzing the above applicable provisions and McKernan's deposition testimony, the Court finds that the Arbitration Agreement does not require Plaintiff to arbitrate its claims in AFI to the extent they involve non-consenting, non-signatories. First, the compulsory provision of the agreement states that all signatory members must arbitrate. The express

language of the provision only refers to "Signatory Companies" and McKernan testified that that the compulsory provision is inapplicable when the claim involves non-signatories. The absence of an exclusion provision specifically addressing potential non-consenting, non-signatory tortfeasors is of no moment because in Article Second the first exclusion makes clear that "[n]o company shall be required, without its **written consent**, to arbitrate any claim or suit if . . . it is not a signatory company nor has given written consent." (emphasis in original). Therefore, the plain language of the Arbitration Agreement is consistent with McKernan's testimony that the compulsory provisions are inapplicable to claims involving non-consenting, non-signatories.

Next, Rule 1-4 gives the filing party the right to pursue litigation where the claim involves non-signatories. According to Rule 1-4, the filing party is required to file its initial claim against all members and consenting non-signatories. If a non-signatory does not consent, the filing party is not allowed to name that party in the claim. Rather, the filing party is entitled to seek its entire tort relief against the member and non-consenting non-signatories. It is the obligation of the responding parties, to implead the non-consenting, non-signatory tortfeasors. McKernan clarified that where the responding party impleads non-consenting non-signatories in the arbitration under Rule 1-4, the filing party has a right to "withdraw" its

application once non-consenting, non-signatory tortfeasors have been named. Rule 1-4 provides that if the filing party allows the claim to proceed in arbitration, it waives the right to proceed against other parties in another forum.

In light of the above, the Court concludes that the arbitration agreement does not require Plaintiff to arbitrate claims in AFI which involve non-consenting, non-signatories. Further, if the Court compels arbitration, Plaintiff could, as it suggests, simply withdraw the case from AFI and pursue litigation.

The Court must also address the contention that the Court should consider Linx's motion to compel arbitration on a claim-by-claim basis in light of the two distinct product lines at issue.

We thus examine claims involving only the supply lines with winged coupling nuts allegedly manufactured by Watts Plumbing Technologies ("WPT") and distributed by Linx and Interline and/or Watts Regulator bearing in mind that Plaintiff Westfield, Linx, and the Watts Defendants are all signatories to the AFI Agreement to Arbitrate and that Interline consents to the arbitration of these claims. Linx and the Watts Defendants argue that claims implicating Linx, the Watts Defendants, and Interline may proceed in arbitration because Interline now consents to arbitrate and MTD's non-consent is irrelevant to these claims. Linx and the

Watts Defendants rely on case law instructing courts to consider whether plaintiff's claim are arbitrable individually, without regard to the potential for piecemeal litigation or the presence of parties not bound by the arbitration agreement. See <u>KPMG LLP v. Cocchi</u>, 132 S. Ct. 23, 26 (2011) ("[W]hen a complaint contains both arbitrable and nonarbitrable claims, the Act requires courts to 'compel arbitration of pendent arbitrable claims when one of the parties files a motion to compel, even where the result would be the possibly inefficient maintenance of separate proceedings in different forums.'") (citation and internal quotation omitted); <u>Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.</u>, 460 U.S. 1, 20 (1983) ("[A]n arbitration agreement must be enforced notwithstanding the presence of other persons who are parties to the underlying dispute but not to the arbitration agreement."); <u>PaineWebber Inc. v. Hofmann</u>, 984 F.2d 1372, 1377 (3d Cir. 1993) (instructing district court to analyze claims separately for motion to compel).

Considering Plaintiff's claims regarding the WPT line of product separately, it is not clear that the Court can compel Plaintiff to arbitrate claims against Linx, the Watts Defendants, and Interline, despite all these parties, including Plaintiff, either being a signatory or consenting to arbitrate. This is due to Plaintiff's exercise of its right, under the AFI Agreement, to withhold its consent to a non-signatory (Interline) participating

in the arbitration. When asked if a non-signatory consented in writing to participate in AFI and the filing party does not want to arbitrate in AFI against that non-signatory, McKernan testified that "it would not be compulsory. If that applicant signatory does not wish to arbitrate, that would be their – I guess their decision to make . . . [A] non-signatory party couldn't compel arbitration against that signatory company. It would be the signatory company's decision to want to resolve its dispute with the non-signatory." McKernan's testimony emphasizes that the filing party decides whether to arbitrate claims against a non-signatory and maintains the right to pursue litigation in claims involving non-signatories. His testimony also comports with the Reference Guide provisions discussing Article Fourth which state that all signatories must consent to the participation of a non-signatory.[11] (See Linx Reply Ex. B at 18) ("Article Fourth also allows a non-signatory to consent to participate in a specific case with the consent of all signatory parties involved in the dispute as well as the non-signatory party.")). Therefore, the Court concludes that even with Interline's consent, the arbitration agreement permits Plaintiff

---

[11] Additionally, the Reference Guide provisions discussing Rule 1-4 provide that where the filing company chooses not to name all potentially liable companies and the responding company impleads another member or consenting nonmember, "the filing company may amend its filing to add the member or consenting nonmember (if the responding company did not do so), allow the case to proceed to hearing as filed, or withdraw its filing."

to withdraw from arbitration in AFI if it chooses. The Court is not inclined to compel arbitration in circumstances contrary to the agreement between the parties. <u>See</u> <u>Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd.</u>, 636 F.2d 51, 54 (3d Cir. 1980) ("Arbitration is a matter of contract between the parties and a judicial mandate to arbitrate must be predicated upon an agreement to that effect.").

## B. Estoppel

With regard to the second issue, MTD and Everlotus cannot be compelled to arbitrate on the grounds of equitable estoppel.[12] First, these Defendants are non-signatories to the arbitration agreement. There is no evidence in the record that MTD or Everlotus benefitted in any way from the arbitration agreement in this case. Consequently, they cannot be said to be "cherry picking" provisions of the agreement to enforce and provisions of the contract to avoid. Neither of these Defendants have reaped benefits from the arbitration contract so equitable estoppel does not apply.

In this case, Linx, a signatory, is trying to force non-signatories to arbitrate based solely on a theory of interrelatedness of the claims alleged. First, this argument does

---

[12] Although Linx initially included Interline in its argument to compel arbitration against non-signatories on the grounds of equitable estoppel, this argument is moot as against Interline because Interline now consents to arbitrate in AFI. Therefore, this section only addresses MTD and Everlotus.

not apply to claims against MTD and Everlotus who are involved in a distinct line of product from the signatory defendants, Linx and the Watts Defendants. Additionally, the Third Circuit expressly addressed this form of equitable estoppel and held that a signatory cannot compel a non-signatory to arbitrate even if the claims against the non-signatory are closely related. See E.I. DuPont de Nemours and Co. v. Rhone Poulenc Fiber and Resin Intermediates, S.A.S., 269 F.3d 187, 201-203 (3d Cir. 2001) ("The distinction between signatories and non-signatories is important to ensure that short of piercing the corporate veil, a court does not ignore the corporate form of a non-signatory based solely on the interrelatedness of the claims alleged."). Second, none of the traditional principles of agency or contract law permit this form of equitable estoppel. Unlike cases where a non-signatory is trying to enforce an arbitration provision against a signatory, here MTD and Everlotus have not signed the AFI Agreement to Arbitrate and have reaped no benefit from the arbitration agreement. They cannot be forced to arbitrate claims based on a contract that is foreign to them when they object to the arbitration forum.

Plaintiff and Linx both rely on EPIX Holdings Corp. v. Marsh & McLennan Companies, Inc., 982 A.2d 1194 (N.J. Super. App. Div. 2009). In Epix, the New Jersey Appellate Division held that in certain circumstances, a non-signatory can compel a signatory to

arbitrate. Id. at 1200-02. However, Epix dealt squarely with a non-signatory who sought to enforce an arbitration clause in a contract signed by its subsidiary corporation. Id. at 1197. Epix did not hold or discuss circumstances in which a signatory can compel a non-signatory to arbitrate when the non-signatory reaped no benefits from the contract containing the arbitration clause. Additionally, the Supreme Court of New Jersey subsequently rejected the reasoning in Epix to the extent it relied on intertwinement of claims independent of the agency relationship between the parent and subsidiary corporations. See Hirsch v. Amper Fin. Servs., LLC, 71 A.3d 849, 860 (N.J. 2013) ("The Appellate Division was mistaken in concluding that the intertwinement of claims and parties in the litigation--in and of itself--was sufficient to give a non-signatory corporation standing to compel arbitration."). Therefore, MTD and Everlotus cannot be compelled to arbitrate based on equitable estoppel.

In light of the foregoing, the Court will deny Linx's motion to compel arbitration.

**IV. Motion to Sever and Transfer by Interline**

Defendant Interline filed a motion to sever and transfer venue on November 18, 2013 after the Court denied its initial motion on the same grounds without prejudice for failure to brief

the appropriate law.[13] The instant motion is opposed by Plaintiff
in its entirety. None of the other defendants responded. For the
reasons discussed below, the Court will deny Interline's motion.

Interline argues that the Olentangy Point & Cove ("Olentangy
Cove") and Betty Carol Williams ("Williams") matters be dismissed
for lack of subject matter jurisdiction for failing to satisfy
the amount in controversy requirement. Interline argues in the
alternative that the matters be severed and transferred to more
convenient venues where the relevant properties are located.
Interline maintains that federal district courts in Ohio,
Tennessee and Indiana are more appropriate forums because that is
where the property damage occurred and where the purchase and
installation of the water supply lines occurred.

Plaintiff opposes Interline's motion, finds no basis to
sever Plaintiff's claims, and argues that New Jersey is an
appropriate forum. Plaintiff does not contest that the harm
occurred outside New Jersey and that the installation of the
allegedly dysfunctional coupling nuts occurred outside New
Jersey. Instead, Plaintiff argues that its claims against the
Defendants are nearly identical because each involves failure of
the coupling nut in the same manner as a result of the same
product defect. Plaintiff's argument supporting the New Jersey

---

[13] Interline re-filed its motion over two weeks after the
expiration of deadline established in the Court's October 1, 2013
Order. Interline has not filed a Reply brief.

forum is that there is no alternative forum where all defendants would be subject to jurisdiction and that any jurisdiction would create inconvenience to witnesses and litigants.

**A. Motion to Sever**

Defendant Interline argues that each individual claim should be severed because joinder was improper under Federal Rules of Civil Procedure 20 and 21 for two reasons. First, Interline asserts that Plaintiff's claims are in fact four individual matters involving four separate occurrences and four separate water supply lines with distinct manufacturers and suppliers. Second, Interline notes that the claims do not involve common questions of law and will require application of the laws of three states.

Plaintiff responds that there is no basis to sever Plaintiff's claims and joinder is proper. Plaintiff minimizes the differences between the claims, alleging that each involves the same defect in the same product line and will require the testimony of the same witnesses on behalf of the defendants. Plaintiff argues that it would suffer significant prejudice if its claims are severed due to the burden and expense of discovery in three states, as well as the potential for statute of limitations defenses in the states where the property damage occurred.

Federal Rule of Civil Procedure 18 governs joinder of claims

in a single action and operates independently of Rule 20, which

governs joinder of parties. 6A Charles Alan Wright & Arthur R.

Miller et al., Federal Practice and Procedure § 1585 (3d ed.).

Before turning to the joinder of claims, the court must first

determine whether the parties have been properly joined. Id. Rule

20(a)(1) provides that multiple plaintiffs may join an action if:

> (A) they assert any right to relief jointly, severally, or
> in the alternative with respect to or arising out of the
> same transaction, occurrence, or series of transactions or
> occurrences; and
> (B) any question of law or fact common to all plaintiffs
> will arise in the action.

Fed. R. Civ. P. 20(a)(1). Rule 20(a)(2) provides that multiple

defendants may be joined if:

> (A) any right to relief is asserted against them jointly,
> severally, or in the alternative with respect to or arising
> out of the same transaction, occurrence, or series of
> transactions or occurrences; and
> (B) any question of law or fact common to all defendants
> will arise in the action.

Fed. R. Civ. P. 20(a)(2). Federal Rule of Civil Procedure 21

states, "[m]isjoinder of parties is not a ground for dismissing

an action. On motion or on its own, the court may at any time, on

just terms, add or drop a party. The court may also sever any

claim against a party." Fed. R. Civ. P. 21.

Plaintiff relies on Rule 42(b) regarding motions for a

separate trial. Although a motion for severance pursuant to Rule

21 is distinct from a motion for separate trial, under both

rules, the decision to sever a claim or try it separately is left

to the discretion of the trial court. Rodin Properties-Shore Mall, N.V. v. Cushman & Wakefield of Pennsylvania, Inc., 49 F. Supp. 2d 709, 720-21 (D.N.J. 1999). "While Rule 21 is silent as to the actual grounds for misjoinder, it is generally accepted that parties are deemed misjoined when they fail to satisfy the preconditions for permissive joinder as set forth in Rule 20(a)." Norwood Co. v. RLI Ins. Co., Civ. 01-6153, 2002 WL 523946, at *2 (E.D. Pa. Apr. 4, 2002); see also Wright, supra, § 1683.

Here, Plaintiff made payments to the Insureds listed in Schedule A of the Amended Complaint according to the terms of the respective insurance policies. Therefore, Plaintiff asserts these claims as subrogee to the rights of the Insureds. Nat'l Fire Ins. Co. of Hartford v. Universal Janitorial Supply Corp., Civ. 05-5945 (AET), 2006 WL 892291, at *2 (D.N.J. Apr. 6, 2006). Plaintiff is a real party in interest entitled to recover the amount paid in its own name, and the Insureds listed on Schedule A are not to be considered separate plaintiffs. United States v. Aetna Cas. & Sur. Co., 338 U.S. 366, 380 (1949). As such, Interline's request to sever on the grounds of improper joinder of plaintiffs is inapposite.[14] Further, in diversity cases, a

---

[14] It is not clear whether Interline's motion is based on improper joinder of defendants or plaintiffs. Interline states, "This matter is almost identical to Malibu Media, but in reverse. In this case, we have four different plaintiffs seeking relief from four different occurrences and transactions . . . Allowing this matter to move forward with the co-plaintiffs joined would

subrogee may aggregate claims to which it is subrogated to meet the amount in controversy requirement of 1332(a). See <u>Allstate Ins. Co. v. Hechinger Co.</u>, 982 F. Supp. 1169, 1172 (E.D. Va. 1997); <u>Liberty Mut. Ins. Co. v. Tel-Mor Garage Corp.</u>, 92 F. Supp. 445 (S.D.N.Y. 1950). Therefore, Interline's argument that the Olentangy Point and Williams matters be dismissed for lack of subject matter jurisdiction for failing to satisfy the amount in controversy requirement is without merit.

The Court also rejects Interline's argument for severance based on a failure to satisfy Rule 20(a)(2). "For courts applying Rule 20 and related rules, 'the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged.'" <u>Hagan v. Rogers</u>, 570 F.3d 146, 153 (3d Cir. 2009) (quoting <u>United Mine Workers of Am. v. Gibbs</u>, 383 U.S. 715, 724, (1966)). "Courts generally apply a case-by-case approach when considering whether the facts of several claims constitute a single transaction or occurrence, or a series of transactions or occurrences." <u>Lopez v. City of Irvington</u>, Civ. 05-5323 (JAG), 2008 WL 565776, at *2 (D.N.J. Feb. 28, 2008) (citation omitted). "'Transaction' is a word of flexible meaning[, and] may comprehend a series of many occurrences, depending not so much

_____

cause undue prejudice to the individual defendants and would confuse a jury." To the contrary, there is only one plaintiff here, asserting four subrogation claims.

upon the immediateness of their connection as upon their logical relationship." Id. (citation omitted). The second Rule 20(a)(2) requirement is less burdensome and permits joinder where there is one question of law or fact common to the parties. Id.

Here, Plaintiff's Amended Complaint alleges that the Insureds' property damage was caused by the same defect in water supply lines "designed, manufactured, marketed, sold, and/or distributed" by the named defendants. (Am. Compl. ¶ 21.) The Amended Complaint does not distinguish between Defendants, the product at issue, or the individual circumstances of each insured's loss. Therefore, the Court finds that Plaintiff has properly joined the named defendants because the facts of each claim constitute a single transaction or occurrence and share at least one common question of law or fact.

Having found Defendants to be properly joined under Rule 20, the Court considers Rule 18 regarding the joinder of claims, and concludes that severance is not necessary to avoid prejudice and promote efficiency and convenience. Rule 18 provides that "[a] party asserting a claim, counterclaim, crossclaim, or third-party claim may join, as independent or alternative claims, as many claims as it has against an opposing party. Fed. R. Civ. P. 18. "Rule 18(a) must be read in conjunction with the practice under Rule 42(b), which gives the court extensive discretionary power to order separate trials of claims or issues" when such treatment

"will be conducive to the expeditious handling of the action, will promote judicial economy, or will avoid prejudice to the litigants." Wright, _supra_, § 1586.

The allegations in Plaintiff's Amended Complaint, taken as true, require resolution of factual and legal questions common to all Insureds and Defendants. The Court credits Plaintiff's argument that the same experts would likely testify for Plaintiff and Defendants respectively with substantially similar testimony for each of the subrogation claims. Arrangements could be made to accommodate witnesses in the states where the property damage occurred. Even if after a detailed choice of law analysis the court were required to apply the law of three separate states, this outcome would not weigh in the interest of severance. Additionally, this case was removed over one year ago and has been subject to significant motions practice, including the Court's denial of two motions to remand in which the Court found proper subject matter jurisdiction. Severance at this stage poses a greater risk of prejudice to Plaintiff by requiring complex litigation of individual product liability claims in separate trials throughout the country. As such, the Court finds that a single trial would serve the convenience of the parties and the courts. Therefore, the Court will deny Interline's motion to sever.

**B. Motion to Dismiss or Transfer**

Interline argues that venue is improper in the United States District Court for the District of New Jersey because none of the alleged events giving rise to the claim occurred in New Jersey and there are other districts in which the action may be brought. Specifically, Interline requests that the Olentangy Point and Koenig matters be transferred to the Southern District of Ohio, the Miller matter be transferred to the Southern District of Indiana, and the Williams matter be transferred to the Middle District of Tennessee. Interline's brief only makes passing mention of improper venue and fails to provide a substantive argument for transfer or dismissal on these grounds. Instead, Interline's brief focuses exclusively on 28 U.S.C. 1404(a), which allows transfer from a proper federal district court to a more convenient district.[15]

Interline argues that another district will best serve the convenience of the parties because the property damage at issue

---

[15] Interline's briefing again relies on <u>Piper Aircraft Co. v. Reyno</u>, 454 U.S. 235 (1981) and the common law doctrine of forum non-conveniens supplanted by 28 U.S.C. §§ 1404 and 1406. "The common-law doctrine of forum non conveniens 'has continuing application [in federal courts] only in cases where the alternative forum is abroad,' and perhaps in rare instances where a state or territorial court serves litigational convenience best." <u>Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.</u>, 549 U.S. 422, 430 (2007) (citations omitted). Here, the alternative forums suggested by Interline--Ohio, Indiana, and Tennessee district courts--are not foreign forums or state courts. Therefore, the common law doctrine of forum non-conveniens does not apply and dismissal on that ground is an inappropriate remedy.

occurred in Ohio, Indiana, and Tennessee and relevant witnesses are located in those states. Further, the state laws of Ohio, Indiana, and Tennessee will apply to each respective claim. Finally, Interline contends that New Jersey has no interest in the matter because Interline's operations are centralized in Jacksonville, Florida and the allegedly defective supply lines were designed and manufactured by various manufacturers in China.

Plaintiff argues that there is no adequate alternative forum available. Plaintiff further contends that its choice of forum is entitled to great deference and public and private factors weigh in favor of the chosen forum. Plaintiff relies heavily on the fact that Defendants Interline and MTD are incorporated in New Jersey and both Interline and MTD conduct significant business in New Jersey. According to Plaintiff, Interline and MTD's connections to the forum state provide New Jersey with a sufficient interest in the litigation. Additionally, Plaintiff notes that Defendants are located in various jurisdictions throughout the country and world. As such, no alternative forum would be more convenient to the parties and witnesses. Finally, Plaintiff argues that litigation in separate jurisdictions throughout the country would require duplicative discovery, increase costs, and risk inconsistent outcomes.

Under 28 U.S.C. § 1404(a) "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may

transfer any civil action to any other district or division where it might have been brought." The Third Circuit has explained:

> In ruling on § 1404(a) motions, courts have not limited their consideration to the three enumerated factors in § 1404(a) (convenience of parties, convenience of witnesses, or interests of justice), and, indeed, commentators have called on the courts to consider all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum.

Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir. 1995) (internal quotations and citations omitted). Accordingly, courts ruling on section 1404(a) motions have taken into account a wide range of public and private interests in determining whether a transfer is appropriate.

Among the private interests that the Jumara court identified as being significant to the section 1404(a) analysis are:

> plaintiff's forum preference as manifested in the original choice; the defendant's preference; whether the claim arose elsewhere; the convenience of the parties as indicated by their relative physical and financial condition; the convenience of the witnesses - but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum).

Id. at 879 (citations omitted). Among the public interests to be considered are:

> the enforceability of the judgment; practical considerations that could make the trial easy, expeditious, or inexpensive; the relative administrative difficulty in the two fora resulting from court congestion; the local interest in deciding local controversies at home; the public policies of

the fora; and the familiarity of the trial judge with the
applicable state law in diversity cases.

Id. at 879-80 (citations omitted). "It is well-settled that the
burden on a § 1404(a) motion must be borne by the party seeking
to transfer the case, and that "the motion must not be lightly
granted." Wright, supra, § 3848; see also Shutte v. Armco Steel
Corp., 431 F.2d 22, 25 (3d Cir. 1970) (noting that "[t]he
decision to transfer is in the court's discretion, but a transfer
is not to be liberally granted") (citation omitted).

## 1. Private Interest Considerations

First, the court finds that the private interest
considerations in this case weigh against transfer. While a
plaintiff's choice of forum is clearly not entitled to
dispositive weight in the section 1404(a) calculus, see In re
Consolidated Parlodel Litigation, 22 F. Supp. 2d 320, 323 (D.N.J.
1998), it is black-letter law that "the plaintiff's choice of
venue should not be lightly disturbed." Jumara, 55 F.3d at 879
(citation omitted); see also Knierim v. Siemens Corp., Civ. 06-
4935, 2008 WL 906244, *20 (D.N.J. Mar. 31, 2008). In light of the
"paramount consideration" accorded to a plaintiff's choice of
venue, Shutte, 431 F.2d at 25, courts in this district have
recognized that "[u]nless the balance of inconvenience of the
parties is strongly in favor of Defendant, [Plaintiff's] choice
of forum should prevail." Clark v. Burger King Corp., 255 F.

34

Supp. 2d 334, 338 (D.N.J. 2003) (citing Shutte, 431 F.2d at 25);
see also Sandvik, Inc. v. Continental Ins. Co., 724 F. Supp. 303,
307 (D.N.J. 1989) (noting that "[t]his requires something more
than a mere preponderance of the evidence in favor of transfer")
(internal quotations and citation omitted).

Interline fails to show that the remaining private interest
considerations weigh "strongly" in favor of transfer. Id.
Interline's most persuasive argument is that the witnesses are
located outside New Jersey. However, this factor fails to tip the
scale in favor of transfer. First, Defendant has provided "no
evidence that any of [these] out-of-state witnesses would be
unwilling to come voluntarily to [this District]." Dobson Bros.
Const. Co. v. D.M. Dozers, Inc., No. 06-3235, 2007 WL 258309, *4
(D. Neb. Jan. 25, 2007). Second, the Court credits Plaintiff's
argument that deposing Defendants' witnesses will require travel
to various locations regardless of where the case is litigated.
This same argument is true of the location of books and records.
Defendant has failed to explain how the burden of producing and
inspecting documents would be diminished in another forum.
Instead, the Court finds that a similar burden will exist
regardless of where the case is litigated.

Other private interest considerations similarly fail to
weigh in favor of transfer. The Court does not find that
considerations of where Plaintiff's "claim arose" favor transfer

because New Jersey and the venues suggested by Interline all have ties to the facts at issue in this case. While the property damage may have occurred in Ohio, Indiana, and Tennessee, Plaintiff's Amended Complaint alleges that the product at the heart of the lawsuit was designed, manufactured, and sold in New Jersey by two defendants incorporated in this state and maintaining substantial contacts with the state. Finally, while recognizing Interline's preference to litigate this dispute in Ohio, Indiana, and Tennessee, the Court is unpersuaded by Interline's argument that three separate venues would serve the interests of convenience and efficiency. Considerable efficiency is gained by coordinating the common discovery in a single forum especially where, as in these claims, a defective design or manufacture of the product is at issue.

## 2. Public Interest Considerations

For similar reasons, the Court does not find that public interest considerations weigh so strongly in favor of transfer as to overcome Plaintiff's choice of forum. First, there is no question that a judgment in this case would be equally enforceable in New Jersey or any of Interline's proposed venues. Similarly, as noted above, the Court credits Plaintiff's argument that parties, documents, and witnesses will have to be transported from one forum to another regardless of where this case is litigated. As such, "practical considerations that could

make the trial easy, expeditious, or inexpensive" do not favor any single forum. _Jumara_, 55 F.3d at 879. As to local interests relevant to deciding local controversies at home, the Court recognizes that various fora may have ties to the damages at issue in Plaintiff's case, since the product allegedly failed in various locations. Based on the allegations in Plaintiff's complaint, this is not a case where the contested forum lacks any connection to the facts at issue. Further, Interline fails to overcome Plaintiff's argument that New Jersey has a substantial interest in a products liability action involving two Defendants incorporated in New Jersey and implicating alleged acts and omissions by Interline and MTD in New Jersey.

Although some public interest considerations could weigh in Interline's favor, they are insufficient to meet Interline's burden when moving to disturb Plaintiff's choice of forum. First, while Interline may be correct that at least some of Plaintiff's claims may be governed by the law of another jurisdiction, federal district courts regularly interpret the laws of other jurisdictions. Disturbing Plaintiff's choice of forum is not justified by assumptions regarding the outcome of a choice of law analysis and the court's lack of familiarity with laws outside its jurisdiction. Second, the Court agrees with the Clark court's observation that "relative congestion of the respective courts' dockets is not a factor of great importance in

this type of motion." Clark, 255 F. Supp. 2d at 338 (citing cases).

For the foregoing reasons, the public interest considerations identified in Jumara do not weigh substantially in Interline's favor. Balanced with the substantial weight of the private interest factors disfavoring transfer, the Court finds that it would serve neither "the convenience of parties and witnesses," nor "the interest of justice" to transfer this case.

**V. Motion for Summary Judgment by Watts Water Technologies**

### A. Introduction

Defendant WWT filed a motion for summary judgment based on a lack of personal jurisdiction as to claims asserted against it by Plaintiff and cross-claims asserted by Defendants Linx and Interline. The motion was initially opposed by Plaintiff in its entirety. Defendants Interline and Linx joined in opposition.

All parties in opposition argued that this motion was premature because it failed to comply with Judge Schneider's April 9, 2013 amended scheduling order. At oral argument on September 20, 2013, the parties agreed to treat WWT's motion as a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). Further, in the October 1, 2013 Order, the Court continued WWT's motion and allowed a period of expedited discovery regarding WWT's contacts with New Jersey relevant to the Court's exercise of personal jurisdiction.

On October 16, 2013, the Court entered an Order dismissing without prejudice Plaintiff's claims against WWT.[16] [Docket Item 170.] Subsequently, Plaintiff did not file supplemental briefing on WWT's motion. As such, the Court will not consider Plaintiff's arguments raised in the initial briefing on WWT's motion.

For the reasons discussed below, the Court will grant WWT's motion to dismiss for lack of personal jurisdiction.

**B. Standard of Review**

When reviewing a motion to dismiss, the court "must accept the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff." Machulsky v. Hall, 210 F. Supp.2d 531, 537 (D.N.J. 2002) (citing Carteret Savings Bank, F.A. v. Shushan, 954 F.2d 141, 142 n.1 (3d Cir. 1992)). After discovery has begun, the nonmoving party cannot rely on the allegations of its complaint in opposing a motion to dismiss for lack of personal jurisdiction. Joint Stock Soc. "Trade House of Descendants of Peter Smirnoff, Official Purveyor to the Imperial Court" v. Heublein, Inc., 936 F. Supp. 177, 192 (D. Del. 1996) (citing Stranahan Gear Co. v. NL Indus., Inc., 800 F.2d 53, 58 (3d Cir. 1986); Time Share Vacation Club v. Atlantic Resorts,

---

[16] The Court's Order followed a "consent order" signed by Plaintiff and WWT dismissing without prejudice Plaintiff's claims against WWT. Linx and Interline entered letters on the docket objecting to dismissal of WWT in light of cross-claims against WWT which they intend to pursue. Accordingly, the Court dismissed Plaintiff's claims against WWT without prejudice to Defendants pursuing their cross-claims against WWT.

Ltd., 735 F.2d 61, 66 n.9 (3d Cir. 1984)). The plaintiff "must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or other competent evidence." Turner v. Boyle, No. 12-7224, 2013 WL 1409903, at *3 n.1 (D.N.J. Apr. 8, 2013) (citing Time Share Vacation Club, 735 F.2d at 61); Patterson by Patterson v. F.B.I., 893 F.2d 595, 603-04 (3d Cir. 1990). Where, no evidentiary hearing is held on the jurisdictional issue, "the plaintiff[s] need only establish a prima facie case of personal jurisdiction and the plaintiff[s] [are] entitled to have [their] allegations taken as true and all factual disputes drawn in [their] favor." O'Connor v. Sandy Lane Hotel Co., Ltd., 496 F.3d 312, 316 (3d Cir. 2007) (quoting Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 97 (3d Cir. 2004)). Accordingly, "the nonmoving party must base its prima facie showing of personal jurisdiction over the moving party on evidence of specific facts set out in the record." Heublein, 936 F. Supp. at 192.

**C. Discussion**

WWT argues that the Court cannot exercise personal jurisdiction because it is a Delaware corporation with its principal place of business in Massachusetts. WWT is a holding company and Watts Regulator is WWT's wholly-owned subsidiary. WPT is a wholly-owned subsidiary of Watts Regulator. WWT does not manufacture, distribute or sell any products. WWT has no contacts

or connection with New Jersey let alone contacts sufficient to establish general or specific jurisdiction in New Jersey.

Linx and Interline argue that WWT is subject to personal jurisdiction in New Jersey based on two theories. First, WWT has sufficient contacts with New Jersey, independent of an alter ego theory, to establish personal jurisdiction, including the solicitation of employees in New Jersey and the employment of authorized sales representatives in New Jersey. Second, WWT is subject to personal jurisdiction based on an alter ego theory because WWT and Watts Regulator are not separate entities.[17] The Court will consider WWT's independent contacts with New Jersey before turning to the alter ego theory.

### 1. Analytic Framework of Personal Jurisdiction

Under Fed. R. Civ. P. 4(e), a district court has personal jurisdiction over nonresident defendants "to the extent authorized under the law of the forum state in which the district court sits." Sunbelt Corp. V. Noble, Denton & Assoc., Inc.*,* 5 F.3d 28, 31 (3d Cir. 1993). New Jersey's long-arm statute extends personal jurisdiction to the boundaries of the Due Process Clause Fourteenth Amendment. See N.J. Ct. R. 4:4-4. Therefore, the Court need only determine whether the assertion of personal jurisdiction over WWT satisfies the Due Process Clause.

---

[17] In the initial briefing, Plaintiff raised substantially similar arguments.

A plaintiff may establish jurisdiction in a forum either by showing that the defendant has continuous and systematic contacts with the forum (general jurisdiction) or that the cause of action arose out of defendant's activities within the forum state (specific jurisdiction). Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 (1984). To establish either general or specific jurisdiction, a plaintiff must show that each of the defendant's relevant contacts with the forum are shaped by purposeful conduct making it reasonable for the defendant to anticipate being haled into court here. World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980). "[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefit of the protection of its laws." Hanson v. Denckla, 357 U.S. 235, 253 (1958).

Specific personal jurisdiction over a nonresident defendant is appropriate when a plaintiff's cause of action arises directly from the defendant's actions in the forum state. Giangola v. Walt Disney World Co., 753 F. Supp. 148, 155 (D.N.J. 1990). Courts must examine the relationship among the defendant, the forum and the cause of action to determine whether the defendant had "fair warning" that it could be brought to suit here. Shaffer v. Heitner, 433 U.S. 186, 204 (1977). A court will presume the

42

existence of fair warning if the defendant directed its
activities at residents of the forum. Keeton v. Hustler Magazine,
Inc., 465 U.S. 770, 774 (1984).

General jurisdiction comports with due process only when the
plaintiff has satisfied the "rigorous" burden of establishing
that the defendant's contacts are continuous and substantial. See
Giangola, 753 F. Supp. at 154. If the defendant maintains
continuous and substantial contacts with the forum generally, the
contacts need not be specifically related to the underlying cause
of action. Int'l Shoe Co. v. Washington, 326 U.S. 310, 318
(1945); Provident Nat'l Bank v. California Fed. Sav. and Loan
Ass'n, 819 F.2d 434, 438 (3d Cir. 1987). "Obviously this is a
much higher threshold to meet for the facts required to assert
this 'general' jurisdiction must be 'extensive and persuasive.'"
Reliance Steel Products Co. v. Watson, Ess, Marshall & Enggas,
675 F.2d 587, 589 (3d Cir. 1982) (quoting Compagnie des Bauxites
de Guinea v. Insurance Co. of North America, 651 F.2d 877, 890
(3d Cir. 1981)).

### 2. Independent Contacts

Linx and Interline argue that WWT has sufficient independent
contacts in New Jersey to establish general jurisdiction.[18] Linx

---

[18] Linx and Interline do not appear to argue that specific
jurisdiction applies as the result of WWT's independent contacts
with New Jersey. Such an argument would be meritless because
there are no allegations that Plaintiff's "cause of action arises

and Interline provide evidence of WWT's contacts with New Jersey in three categories: (1) WWT's recruitment of employees to work in New Jersey, (2) WWT's solicitation of business in New Jersey, and (3) WWT's creation of a network in New Jersey to distribute its products.

In support of its argument that WWT recruits employees to work in New Jersey, Linx relies on "no less than six (6) well-known job search websites, including Monster and NewJerseyJobDaddy" through which WWT allegedly posts jobs for WWT in New Jersey. (Linx Supp. Exs. E-J [Docket Item 188-3.]) These jobs include two positions for a sales branch shipping/receiving clerk, shipping and receiving clerk, branch sales manager, and branch sales support/inside sales engineer. (Id.) Additionally, Linx contends that WWT's own website lists three job openings in Cherry Hill, New Jersey. (Linx Supp. Ex. K [Docket Item 188-3.]) Linx argues that even if, as WWT contends, these jobs are for a subsidiary of Watts Regulator called Watts Water Quality, WWT is still conducting significant recruitment efforts in New Jersey.

WWT responds that Linx's reliance on third party websites is misplaced because they are unreliable and inadmissible. WWT also argues that the listings on third party websites are either incorrect or Linx misconstrues the documents it relies upon

_____

directly from" WWT's actions in New Jersey. Giangola, 753 F. Supp. at 155.

because WWT does not employ or solicit employees in New Jersey. WWT relies on the sworn statements of WWT's human resources director, David Mercieri, and WWT's corporate designee in this litigation, Leo Maguire, stating that WWT is not seeking employees in New Jersey and all three jobs identified are for employment with a Watts Regulator subsidiary, Watts Water Quality and Conditioning. (WWT Reply [Docket Item 122] at 4; WWT Reply Ex. 5 [Docket Item 126-5] ¶¶ 4-6; Deposition of Leo Maguire on November 4, 2013 ("11/4/13 Maguire Dep.") [Docket Item 194-2] 52:5-58:23.)

The Court recognizes that hearsay or unauthenticated evidence that would be inadmissible at trial should not be considered in opposition to a motion. Pamintuan v. Nanticoke Mem'l Hosp., 192 F.3d 378, 387 n.13 (3d Cir. 1999). Courts in this Circuit have found print outs from third party websites to be hearsay and unauthentic without a certification from someone with personal knowledge of the website. See Southco, Inc. v. Fivetech Tech. Inc., Civ. 10-1060, 2013 WL 6008180, at *6-7 (E.D. Pa. Nov. 12, 2013); Agrizap, Inc. v. Woodstream Corp., 450 F. Supp. 2d 562, 569 n.4 (E.D. Pa. 2006). The Court agrees that that the third party websites are hearsay and finds the certification by counsel for Linx insufficient to authenticate the websites. However WWT's own website does not present this same deficiency and the Court considers WWT's own website evidence of WWT's

45

recruitment of employees in New Jersey either for itself or Watts Water Quality and Conditioning.

In support of its argument that WWT solicits business in New Jersey, Linx relies on two "company data search engine[s]"[19] that list information about WWT indicating that WWT operates a facility in Manasquan, New Jersey. (Linx Supp. Exs. P, Q [Docket Item 188-4.]) One website lists Joe Penza as "Director" and Joe Penxa as "Manager." (Linx Ex. Q.) Penza's LinkenIn account lists WWT as his employer from 2000 to 2011. (Id.) Further, Linx contends that there are three representatives selling WWT branded products in New Jersey. The generic Watts website, www.watts.com contains a "Find a Sales Representative" link that identifies three representatives listing sales territories in New Jersey: Edwards, Platt & Deely in Hawthorne, NJ; Vernon Bitzer Assoc. Inc. in Warminster, PA; and Thermo in Clifton, NJ. (Linx Supp. Ex. S [Docket Item 188-4.]) Linx contends that Edwards, Platt & Deely's website indicates that it represents WWT, not Watts Regulator or any other subsidiary, and identifies WWT as the manufacturing entity for Febco and Ames. However, a review of these documents indicates that Edwards, Platt & Deely represent Ames and Febco, both listed as "A Watts Technologies Co."[20] (Id.)

---

[19] The websites Linx relies on are "companies.findthecompany.com" and "www.manta.com." (Linx Supp. Br. [Docket Item 188] at 6).
[20] The Edwards, Platt & Deely website also suggests that Edwards, Platt & Deely represents Watts Brass & Tubular, Watts Drainage

In response, WWT notes that Maguire testified that WWT does not have any sales representatives. (11/4/13 Maguire Dep. 108:8-109:20.) The sales representatives found on www.watts.com, including Edwards, Platt & Deely are for Watts Regulator and its subsidiaries and divisions. (Id.) WWT also notes that Linx has misconstrued or misstated the information contained on the websites referenced above. (Id. 108:19-11:15.) Further, Maguire clarified at his deposition that Penza was actually employed by Watts Regulator. (Id. 68:18-69:1.)

The Court finds that the evidence relied on by Linx does not support the contention that WWT solicits business in New Jersey. As explained above, the third party company data websites are hearsay and unauthenticated. Even if they were admissible, these websites refer explicitly to a different company, Power Process Controls, a division of Watts Regulator. Further, the www.watts.com website does not refer exclusively to WWT, but encompasses all of the Watts entities, and Linx misrepresents the information on the Edwards, Platt & Deely website. Even when viewed most favorably to Linx, these documents are insufficient to show that WWT solicits business in New Jersey.

Finally, in support of its contention that WWT operates a distribution network in New Jersey, Linx relies on shipping

Products, and Watts Regulator Co., but none of these listings include any reference to WWT. (Id.)

manifests compiled by Zepol from February 2007 through July 2012.[21] Linx argues that these documents identify 57 occasions when WWT listed a New Jersey address as "consignee address" and 14 occasions when Newark, New Jersey is listed as the port of unlading.[22] (Linx Ex. T [Docket Item 188-4.])

WWT responds that the information relied upon by Linx is incorrect because as Maguire testified, WWT does not act as the consignee for any products. (11/4/13 Maguire Dep. 167:13-173:23.) WWT also argues that the data provided by Zepol is unreliable hearsay and should be stricken.

The Court agrees with WWT that the information relied upon by Linx is unreliable and unauthenticated. Zepol specifically warns that not all of the information is accurate because "there may be data entry errors on behalf of the importer" and Customs and Border Protection "does not review or certify the data reported by Zepol or any trade provider." (Linx Ex. T.) Further, Linx cites no rule of evidence under which the document would be admissible, and the only testimony in the record from someone with personal knowledge expressly states that WWT does not act as

---

[21] Linx attaches a spreadsheet and a "data certification" from Zepol explaining that the data was generated by Zepol's database application that converts raw data from the United States Customs and Border Protection to usable form for private and public industry. (Linx Supp. Ex. T [Docket Item 188-4.])

[22] Upon review, this document only lists "Watts Water Technologies Inc." as consignee on 14 occasions. It lists "Watts Industries" as consignee on 58 occasions, 52 of which are accompanied by a New Jersey address.

the consignee for any products. Linx provides no additional citation to the record to support its claim that WWT maintains a distribution network in New Jersey.

In light of the above, the Court is left only with job postings on WWT's own website suggesting recruitment efforts in New Jersey for itself or Watts Water Quality and Conditioning. However, such recruitment efforts are not the type of "continuous and systematic" contacts necessary to establish general jurisdiction in New Jersey. See Bootay v. KBR, Inc., 2:09-CV-1241, 2010 WL 1257716, at *2 (W.D. Pa. Mar. 26, 2010) ("The recruiting of employees from within a state is clearly an insufficient basis for 'general jurisdiction.'") (citing Gehling v. St. George's School of Medicine, Ltd., 773 F.2d 539 (3d Cir. 1985); Corrales Martin v. Clemson University, Civ. 07-536, 2007 WL 4531028 (E.D. Pa. 2007)). Therefore, the Court concludes that the nonmoving parties have failed to establish a prima facie showing of personal jurisdiction over WWT in New Jersey based on independent contacts with the state.[23]

---

[23] Linx also argues that WWT has a history of litigating cases in New Jersey as a basis for this Court's exercise of personal jurisdiction. First, the Form 10-K filings upon which Linx relies make clear that the information therein refers to "Watts Water Technologies, Inc. and its consolidated subsidiaries." (WWT Supp. Ex. 4 [Docket Item 194-5] at 2.) Linx's exhibits omit this prefatory section of the Form. (See Linx Supp. Exs. R, U, V [Docket Item 188-4.]) Second, Linx cites no authority holding that a party's decision in prior litigation not to contest jurisdiction prevents it from doing so subsequently.

### 3. Alter Ego

Linx and Interline argue that WWT is subject to personal jurisdiction in New Jersey because it is an alter ego of Watts Regulator, the Watts entity in this litigation that does not contest jurisdiction. In response to a dispute among the parties regarding the scope of limited discovery allowed by the Court's October 1, 2013 Order, the Court denied Linx's request for jurisdictional discovery on its alter ego theory without prejudice to Linx arguing for such basis of personal jurisdiction and without prejudice to pursuing an alter ego theory on the merits. The Court reasoned that such discovery was beyond the scope of the limited discovery contemplated by the Court's October 1 Order.

As more fully discussed below, there is insufficient evidence in the record to establish personal jurisdiction over WWT based on an alter ego theory, and the Court will deny Linx's request for additional discovery.

"[W]here appropriate, courts of New Jersey have looked beyond the corporate form to the functional reality behind it" for the purpose of determining personal jurisdiction. Star Video Entm't, L.P. v. Video USA Assocs. 1 L.P., 601 A.2d 724, 727 (N.J. Super. Ct. App. Div. 1992). "If the disputed facts are resolved sufficiently to provide a basis for holding liable the individual defendants under alter ego theory, their presence for

jurisdictional purposes cannot be said to be either unfair or unreasonable." Id. The alter ego theory is applicable where one entity dominates another so that they can be considered a cohesive economic unit. State Dep't of Envtl. Prot. v. Ventron Corp., 468 A.2d 150, 164 (N.J. 1983).

Under New Jersey law, two elements are required to pierce the corporate veil: "First, there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist. Second, the circumstances must indicate that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." State Capital Title & Abstract Co. v. Pappas Bus. Services, LLC, 646 F. Supp. 2d 668, 679 (D.N.J. 2009) (internal citations omitted). Various factors may be considered in making these determinations, including, inter alia, failure to observe corporate formalities, gross undercapitalization, absence of corporate records, siphoning of funds of the corporation, and the corporation's existence as a façade for the operations of the dominant stockholder. Craig v. Lake Asbestos of Quebec, Ltd., 843 F.2d 145, 150 (3d Cir. 1988) (outlining factors for piercing corporate veil in context of analyzing case under New Jersey law).

New Jersey courts have pierced the corporate veil under an alter ego theory where corporate defendants "commingled funds and operated in each others' names." Stochastic Decisions, Inc. v.

DiDomenico, 565 A.2d 1133, 1136 (N.J. Super. App. Div. 1989)

(relying on My Bread Baking Co. v. Cumberland Farms Inc., 233

N.E.2d 748 (Mass. 1968) for proposition that alter ego liability

may be established "when there is a confused intermingling of

activity of two or more corporations engaged in a common

enterprise with substantial disregard of the separate nature of

the corporate entities, or serious ambiguity about the manner and

capacity in which the various corporations and their respective

representatives are acting."); see also In re Monroe Ctr. II

Urban Renewal Co., LLC, No. 08-32556 (DHS), 2012 WL 3638602, at

*4 (Bankr. D.N.J. Aug. 22, 2012) (piercing the corporate veil

where various entities involved in a multi-phase development

project "were viewed as and represented to be part of a single

project").

Here, Linx and Interline argue that WWT and Watts Regulator

are indistinguishable and the court should impute Watts

Regulator's contacts with the forum to WWT under an alter ego

theory.[24]

---

[24] Linx's initial brief on the alleged alter ego relationship
between WWT and Watts Regulator begins with an effort to refute
WWT's assertion that it is merely a holding company that does not
manufacture, process, service, distribute or sell any products in
New Jersey or elsewhere. (See Linx Opp. [Docket Item 111] at 12-
13; WWT Br. [Docket Item 75-2] at 1; see also Linx Supp. Br. at
12-13.) Linx points to a series of documents including: (1) an
arbitration decision in which WWT stated it "is an international
manufacturer and distributor of Innovative Water Solutions for
plumbing & heating and water quality markets," (Linx Opp. at 12;

52

Linx relies upon a series of documents to support its

contention that there is no distinction between WWT and Watts

Regulator. Linx contends that WWT maintains a website,

wattswater.com, which refers to WWT and Watts Regulator

interchangeably. (Certification of Susan L. Swatski, Esq., dated

July 22, 2013 [Docket Item 116] ¶¶ 27-29.) Linx contends that

Watts Regulator and WWT's corporate officers are identical with

the exception of Srinivas K. Bagepalli, an employee of WWT. (Linx

Opp. Exs. V, W [Docket Item 116-3].) While Bagepalli is Watts

Regulator's President, he is not on WWT's Board. (Id.) Linx

contends that WWT's 2012 Form 10-K filing with the SEC makes no

distinction among any of the various Watts entities. (Linx Opp.

Ex. X [Docket Item 116-4] at 56.) Linx further alleges that

certain employees perform duties for both WWT and Watts

Regulator. (Linx Opp. at 16.) Linx specifically identifies Leo

Maguire, Vice President of Global Taxation for WWT, who also

see also Linx Opp. Ex. AAA [Docket Item 116-7] at 3); (2) WWT's
10-K filing with the SEC stating that Watts Water sells a "broad
range of products" to "plumbing, heating and mechanical wholesale
distributors, major DIY chains and OEMS" (Linx Opp. at 12-13; see
also Linx Opp. Ex. X [Docket Item 116-4] at 3); and (3) two
websites through which WWT advertises  sales positions at WWT in
Andover, MA (Linx Supp. Exs. W, X [Docket Item 188-4]). The Court
sees no need to address these documents in detail because they
fail to address the alleged alter ego relationship between WWT
and Watts Regulator. Upon review, the Court is unpersuaded that
the statements in these documents are anything but the mistakes
of third-parties or unremarkable evidence of a parent-subsidiary
relationship.

provides accounting and payroll services to Watts Regulator.[25]
(Id.) Linx identifies two other employees, John McCabe and Jeff
Scilingo, who have signed verifications in previous legal
proceedings on behalf of one entity despite being employed by the
other. (Id. at 17; see also Linx Opp. Ex. FF [Docket Item 116-
5].)

   WWT responds by rejecting any evidence that WWT holds itself
out as a manufacturer of products as either misconstrued
marketing materials or mistakes by third parties. WWT denies that
it shares identical corporate officers with Watts Regulator. (WWT
Reply Ex. 6 [Docket Item 126-6] ¶¶ 6-8.) WWT explains that WWT
has eleven officers and Watts Regulator has fifteen, acknowledges
some overlap, but denies that they are identical. (Id.) WWT
attributes the discrepancy regarding the actual employer of
McCabe and Scilingo to inaccurate statements or mistakes by

---

[25] In its supplemental briefing, Linx includes additional
contentions that supplement its argument that WWT and Watts
Regulator share tax and payroll departments. Linx notes that
Maguire is the Vice President of Global Taxation for WWT and an
Assistant Secretary for Watts Regulator and he signs tax returns
for Watts Regulator and its subsidiaries. (Deposition (Deposition
of Leo Maguire on June 28, 2013 ("6/28/13 Maguire Dep."), Linx
Supp. Ex. EE [Docket Item 188-5] 27:6-15.) In some jurisdictions,
WWT and Watts Regulator file joint tax returns. (Id.) Salaried
personnel at WWT, including Maguire, receive paychecks listing
Watts Regulator on the check and W-2 forms issued by Watts
Regulator.[25] (6/28/13 Maguire Dep. 76:24-77:12.) Further, Linx
contends that WWT controls payroll disbursements for Watts
Regulator. (Deposition of Leo Maguire on August 23, 2012
("8/23/12 Maguire Dep."), Linx Supp. Ex. FF [Docket Item 188-5]
20:12-21:16.)

others. WWT does not deny that WWT and Watts Regulator share a tax department, but contends that this fact does not support a finding of dominance and control necessary to pierce the corporate veil, nor is it relevant to the issues in this case. Additionally, WWT argues that Linx has provided no evidence of fraud or injustice as required under the second prong of the alter ego analysis under New Jersey law.

The evidence cited above by Linx and Interline does not provide a basis for the Court to find an alter ego relationship between WWT and Watts Regulator. First, there is no evidence to support the conclusory allegations in Linx's cross-claim for declaratory judgment regarding the Craig factors including failure to observe corporate formalities, gross undercapitalization, absence of corporate records, siphoning of funds of the corporation, and the corporation's existence as a façade for the operations of the dominant stockholder. Second, the documents relied upon by Linx do not establish dominance and control as required to establish an alter ego relationship under New Jersey law. See State, Dep't of Envtl. Prot. v. Ventron Corp., 468 A.2d 150, 165 (N.J. 1983) (finding insufficient evidence of dominance even where parent corporation's "personnel, directors, and officers were constantly involved in the day-to-day business" of a wholly-owned subsidiary). At most, they suggest a parent-subsidiary relationship in which the lines

between the distinct entities are occasionally blurred by the
entities themselves or third parties. Even if the corporate
boards of WWT and Watts Regulator were identical, which they are
not, this would not establish an alter ego relationship. See
United States v. Bestfoods, 524 U.S. 51, 69 (1998) (quoting
American Protein Corp. v. AB Volvo, 844 F.2d 56, 57 (2d Cir.
1988) ("[I]t is entirely appropriate for directors of a parent
corporation to serve as directors of its subsidiary, and that
fact alone may not serve to expose the parent corporation to
liability for its subsidiary's acts."). While the Court is
troubled by the various occasions cited by Linx in which WWT or
Watts Regulator employees improperly identify their actual
employer, such confusion does not rise to the level of "serious
ambiguity about the manner and capacity in which the various
corporations and their respective representatives are acting."
Stochastic Decisions, Inc., 565 A.2d at 1136. Finally,
cooperation between the entities for certain administrative
functions, such as tax and payroll, is also insufficient.
Therefore, the Court concludes that Linx and Interline have
failed to satisfy the first prong of the test to establish an
alter ego relationship.

Considering the second prong, Linx has made no showing of
fraud or injustice. The Watts Defendants have represented to this
Court that Watts Regulator is the appropriate Watts entity to be

named in this suit and that Watts Regulator is fully capitalized. Consistent with these statements, Watts Regulator has not contested the Court's jurisdiction. As such, this is not a shell game where a potentially liable party is seeking to hide behind another. Even if that were the case, the Third Circuit noted in Craig that "evasion of tort liability has never, in itself, been sufficient basis to disregard corporate separateness." Craig v. Lake Asbestos of Quebec, Ltd., 843 F.2d 145, 150 (3d Cir. 1988). Therefore, Linx and Interline have failed to provide any evidence to satisfy the second prong.

Linx also argues that if the Court does not find an alter ego relationship between WWT and Watts Regulator based on the present record, the Court should permit jurisdictional discovery. Linx relies on Flagship Interval Owner's Ass'n, Inc. v. Philadelphia Furniture Mfg. Co., in which this Court concluded that plaintiff's facts satisfied its burden to defeat a motion to dismiss for lack of personal jurisdiction and justify jurisdictional discovery. Civ. 09-1173 (JBS/JS), 2010 WL 1135736, at *7 (D.N.J. Mar. 22, 2010). The facts of Flagship are clearly distinguishable from the instant case. In Flagship, the Court stated, "Plaintiff's facts, if assumed to be true, establish that there was no actual distinction between Philadelphia Furniture and Artone; they were run by and employed the same people, they sold the same furniture, they sought to enforce the same

contractual obligations, and they asserted rights over the assets of the other." Id. at *6. Here, the Court has reached no such conclusion. Instead, as discussed above, Linx has failed to adequately support its allegations of dominance or control sufficient to establish an alter ego relationship between WWT and Watts Regulator. Additionally, Linx has made no showing of fraud or injustice. Therefore, the Court will not order additional jurisdictional discovery.

## VI. Conclusion

For the reasons discussed above, the Court will deny Linx's motion to compel arbitration because the relevant arbitration forum rules do not permit the Court to compel arbitration where the claims implicate non-consenting, non-signatories. Exercising its discretionary power and finding no compelling reasons to do so in the interest of expediency or convenience, the Court will deny Interline's motion to sever and transfer. The Court will grant WWT's motion to dismiss for lack of personal jurisdiction because the nonmoving parties have failed to make a prima facie showing of personal jurisdiction over WWT in New Jersey based on independent contacts or an alter ego relationship with Watts Regulator. An accompanying Order will be entered.


 December 19, 2013                    s/ Jerome B. Simandle
Date                                 JEROME B. SIMANDLE
                                     Chief U.S. District Judge